# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**JESSICA SAMPSON**
            **Plaintiff,**

        **v.**                                                    **Case No. 21-C-318**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
            **Defendant.**

---

## DECISION AND ORDER

Plaintiff Jessica Sampson applied for social security disability benefits, alleging that she could not work due to the symptoms of Crohn's disease. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff could still perform light work, done indoors, and thus denied her application. Plaintiff seeks judicial review of the denial, arguing that the ALJ failed to account for her bowel urgency or frequency, failed to build an accurate and logical bridge from the evidence to his conclusion regarding the credibility of her statements, and erroneously discounted the opinions of her treating providers.

## I. LEGAL STANDARDS

The Social Security Administration uses a five-step test to determine whether a claimant is eligible for SSI benefits. At step one, the ALJ asks whether the claimant is working, i.e., engaging in "substantial gainful activity." If not, at step two the ALJ asks whether the claimant has a "severe" physical or mental impairment. If yes, then at step three the ALJ determines whether the claimant's condition meets or equals the severity of one of the impairments listed in the regulations as presumptively disabling. If yes, the claimant qualifies for benefits. If no

Listing applies, then before proceeding to step four the ALJ must ascertain the claimant's "residual functional capacity" (RFC), which is the most the claimant can still do despite the limitations resulting from her impairment(s).  With the benefit of the RFC, the ALJ moves to step four, which requires the ALJ to deny benefits if the claimant is capable of performing her past relevant work.  If not, the ALJ moves to step five, determining whether there are a significant number of (other) jobs in the national economy that the claimant could perform, given her RFC, age, education, and work experience.  Poole v. Kijakazi, 28 F.4th 792, 794 (7th Cir. 2022).

The court reviews an ALJ's decision to ensure that it is supported by "substantial evidence" and free of harmful legal error.  Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).  "Substantial evidence" means evidence that a reasonable mind might accept as adequate to support a conclusion.  Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022).  The court will not re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination.  Id.  This is a deferential but not entirely uncritical standard, as the ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.  Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003).

If the reviewing court determines that the matter must be remanded, "the ordinary remedy is a new hearing before an administrative law judge.  In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding of disability, a court may order an award of benefits."  Kaminski v. Berryhill, 894 F.3d 870, 875 (7th Cir. 2018); see also Martin v. Saul, 950 F.3d 369, 376 (7th Cir. 2020) ("That remedy is a marked departure from our typical practice of remanding to the agency for further

2

proceedings.").

## II.  FACTS AND BACKGROUND

### A.     Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits on September 16, 2019, alleging a disability onset date of March 31, 2011.  (Tr. at 204, 208, 241, 245.)  In a function report, she indicated that she had fistulizing Crohn's disease with fecal urgency that made her bathroom needs unpredictable and urgent.  She experienced severe anxiety about leaving the house and not having prompt bathroom access.  She also reported suffering from fatigue after bowel movements, stool leakage that irritated her skin, and sporadic rectal bleeding from sitting for long periods or frequent bowel movements.  (Tr. at 225.)  She reported no problems with personal care on a routine basis (Tr. at 226), cooking simple meals, and performing house and yard work for short periods of times (Tr. at 227).  She went out several times per week, driving a car, shopping in stores (Tr. at 228) and attending exercise classes (Tr. at 229).  She also attended as many of her parents' doctors' appointments as possible.  (Tr. at 233.)  She explained that, when she had to go out, she ate only a small amount before leaving.  (Tr. at 233.)  She reported that her impairment affected her ability to lift, squat, bend, stand, walk, sit, climb stairs, remember, complete tasks, and concentrate.  (Tr. at 230.)

In an attachment to the report, plaintiff stated that being able to sit comfortably was rare; she spent most of her time lying down.  There were stretches where she could not drive due to rectal pain and relied on her parents to take her to appointments, pick up prescriptions, and grocery shop for her.  (Tr. at 237.)  Given her extensive treatment and symptoms, she developed depression (Tr. at 239) for which she saw a psychologist (Tr. at 240).  She

3

concluded:

> I never expected that starting at age 40 ½, I would have no bowel control.  That I would live my life constantly scanning for where the restroom is.  That it would become normal to shove gauze in my butt.  That leaving home to do the simplest errand like mailing bills would cause such anxiety I would stop leaving home.  That I would be so worn out from stress and fatigue I would walk two feet from one room to another in my house and have no clue what I was looking for.

(Tr. at 240.)

The agency denied the application initially on November 8, 2009 (Tr. at 65, 116, 120), based on the review of Patrick Belson, D.O., who concluded that plaintiff could perform light work (Tr. at 72, 84-85), and Frank Grosz, Ph.D., who found plaintiff's depression non-severe (Tr. at 82).  Plaintiff requested reconsideration (Tr. at 290), but the agency maintained the denial on April 2, 2020 (Tr. at 88, 130, 135), based on the review of Marc Young, M.D., and Catherine Bard, Psy.D., who agreed with the previous assessments (Tr. at 98, 109, 111-13).

Plaintiff then requested a hearing before an ALJ.  (Tr. at 150.)  In a pre-hearing brief, she amended the alleged onset date to September 16, 2019.  (Tr. at 414.)  She also submitted medical source statements from Caroline Fox, her treating physician's assistant, and Dr. Andres Yarur, her treating gastroenterologist.  (Tr. at 1157-61, 1569-71.)  Ms. Fox endorsed a number of limitations, including the need for a sit/stand option at will; ready access to a restroom; unscheduled breaks two to three times daily, lasting about 15 minutes, with no advance notice; the need to lie down or rest at unpredictable intervals during the workday due to pain, with this occurring weekly and lasting 10-15 minutes; and about three absences per month.  (Tr. at 1158-60.)  Dr. Yarur opined that plaintiff would, due to her symptoms, be off task more than 15% of the time; needed ready access to a bathroom; and required unscheduled breaks four times per workday due to her symptoms, as well as two additional breaks per day

4

to lie down or change soiled clothing. (Tr. at 1569-70.) Dr. Yarur concluded: "[Plaintiff] has not been able to work for years due to her Crohn's and fistulas." (Tr. at 1571.)

## B. Hearing

On September 17, 2020, the ALJ held a telephonic hearing. The ALJ also called a vocational expert to provide testimony on jobs plaintiff might be able to do. (Tr. at 32.)

Plaintiff testified that she had been diagnosed with Crohn's disease, including several fistulas, for which she had undergone a number of operations, the last in 2018 (Tr. at 40), as well as the surgical placement of several setons (Tr. at 40-41.) In addition to the setons, she received biologic treatment (a monthly injection) and had been going to physical therapy. She testified that she had two to four bowel movements per day on average. (Tr. at 41.) During a flare-up, it was closer to six times. (Tr. at 49.) Flares usually lasted a day or so and occurred once or twice per month. (Tr. at 49.)

Plaintiff testified that her Crohn's would prevent a full-time job due to fatigue, rectal bleeding/pain, and urgent need to use the bathroom. (Tr. at 42.) If she did not make it to the bathroom within 30 seconds, she would need to shower and/or change her clothes. (Tr. at 49.) Plaintiff explained that if she was planning to leave the house she tried not to eat any substantial meal. (Tr. at 50.) She testified that due to fatigue she usually spent about ½ of a normal eight hour daytime period lying down. (Tr. at 50.)

Plaintiff further testified that she experienced dryness in her eyes and sensitivity to sunlight (Tr. at 43), for which she used drops (Tr. at 44). Looking at a computer or phone screen also caused irritation. (Tr. at 51.) She had seen a therapist and psychologist for depression (Tr. at 45) and took medication (Tr. at 46).

Plaintiff testified that she could stand for ½ hour, sit for ½ hour, walk for 20 minutes, and

5

lift about 20 pounds.  (Tr. at 46.)  She reported no ongoing difficulties with self-care; she could cook simple meals, perform household chores, and shop in stores.  (Tr. at 47.)  Before COVID, she attended an exercise class.  (Tr. at 48.)

The ALJ then turned to the VE, asking a hypothetical question assuming a person of plaintiff's age, education, and experience, limited to light work and no exposure to weather (so no outside jobs).  (Tr. at 52-53.)  The VE testified that such a person could work as a cashier, photocopy machine operator, and cleaner/housekeeper.  (Tr. at 53.)  The VE further testified, regarding extra restroom breaks, that employers would tolerate 5% total time of the eight hour shift.  (Tr. at 58.)  If the person needed to suddenly leave the work station to use the bathroom for up to 15 minutes, and this happened two times per week or eight times a month, there would be no jobs.  (Tr. at 59.)  The job numbers would be eroded if the person needed a work station allowing her to get to the restroom within 30 seconds.  (Tr. at 61.)  The need to lie down half the day would eliminate all jobs.  (Tr. at 62.)

## C.    ALJ's Decision

On October 21, 2020, the ALJ issued an unfavorable decision.  (Tr. at 11.)  Following the five-step process (Tr. at 16-17), the ALJ determined that plaintiff had not worked since September 16, 2019 (Tr. at 17); that she had the severe impairment of Crohn's disease (Tr. at 17);[1] that her impairment did not meet or equal the severity of a Listing (Tr. at 19-20); that she had the RFC to perform light work, except that she had to avoid all exposure to weather, i.e., no jobs performed outdoors (Tr. at 20); that she had no past relevant work (Tr. at 25); and that given her age, education, work experience, and RFC, she could perform jobs existing in

---

[1]The ALJ found plaintiff's depression non-severe.  (Tr. at 17-19.)  Plaintiff does not challenge this determination, so I do not further discuss her mental impairments.

significant numbers, as identified by the VE, including cashier, photocopy machine operator, and cleaner/housekeeping (Tr. at 25-26).

In determining RFC, the ALJ considered plaintiff's statements concerning her symptoms and limitations, the objective medical evidence, and the medical opinions and prior administrative medical findings. (Tr. at 20.) Plaintiff alleged that her Crohn's disease affected her ability to lift, squat, bend, stand, walk, sit, climb stairs, sleep, remember things, complete tasks, and concentrate. More specifically, she described frequent bowel movements: two to four on a good day and six on a bad day, with bad days at least twice per month. She also described fecal urgency and incontinence, as well as associated weakness and fatigue. She testified that she was limited to continuous standing for 30 minutes, sitting for 30 minutes, walking just a few minutes, and lifting 20 pounds. She explained that her digestive condition had not improved despite biologic infusions, immunosuppresive therapy, physical therapy, and repeated rectal procedures. Finally, she testified that she restricted her eating on days she had to leave the house so as to reduce the likelihood of a bowel movement when away from home. (Tr. at 21.)

The ALJ found that plaintiff's impairments could reasonably be expected to cause the alleged symptoms. However, her statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 21.)

In support of this finding, the ALJ first reviewed the medical evidence, noting that plaintiff was diagnosed with Crohn's disease in 2013, undergoing a variety of procedures and treatments prior to September 2019 (the alleged disability onset date). (Tr. at 21-22.) By August and September 2019, plaintiff reported improvement, and that she was feeling good

7

since increasing the frequency of her immunosuppressive injections. She also indicated fewer bowel movements, sometimes only two per day. Pelvic imaging confirmed that her condition was improved, and her gastroenterologist declined further surgical intervention, citing her mild incontinence, recommending only nutritional counseling and ongoing immunosuppressive therapy. In October 2019, plaintiff reported increased symptoms, including bowel movements seven to eight times per day; however, the record reflected that she had yet to follow through on the referral to a dietician. When she did finally consult with the dietician in late 2019, the dietician recommended only conservative measures. (Tr. at 22.) Plaintiff's subsequent treatment in 2019 and 2020 was conservative (e.g., physical therapy targeted at strengthening her pelvic floor muscles, continued injections, and over-the-counter supplements and medications to manage symptoms); she reported about three bowel movements per day, her baseline frequency; and her gastroenterologist noted that her seton and fistula were stable, indicating she did not need to return for a check-up for six months. (Tr. at 22-23.)

The ALJ then provided a number of specific reasons for discounting plaintiff's claims of disabling symptoms. First, plaintiff described daily activities that were not limited to the extent one would expect given the functional deficits she alleged. Plaintiff alleged disabling rectal pain and fecal incontinence, causing extertional limits and isolation in her home. Yet she reported cooking meals, grocery shopping, attending exercise classes, and accompanying her elderly parents to their numerous medical appointments. The ALJ noted that these activities likely involved standing and walking in excess of plaintiff's alleged tolerances, as well as time away from a restroom. More specifically, these activities, particularly those outside the home, called into question her allegation that she had to remain within 30 seconds of a bathroom at all times. (Tr. at 23.)

8

Second, plaintiff submitted a diary tracking her bowel movements from December 2019 to March 2020. The diary indicated that most days she had one to three bowel movements; on eight days during this period she had four or five; she only reported one day when she had six. This contradicted plaintiff's hearing testimony that she had bad days twice per month, with six bowel movements on those days. (Tr. at 23.)

Third, the ALJ noted that plaintiff's treatment since the alleged onset date had been conservative and limited. The ALJ acknowledged her extensive treatment in the years following her Crohn's diagnosis. However, the record reflected improvement after she began her immunosuppressive regime. Some of her fistulas resolved, and some of her setons were removed; her gastroenterologist recommended several times since late 2019 that the remaining seton be removed. (Tr. at 23.)

Finally, the ALJ noted that plaintiff did not require any invasive procedures after the amended alleged onset date. She did not undergo any incision and drainage of abscesses, any unroofing of fistula tracts, any debridement of fistulas, or new seton placements. (Tr. at 23.)

As for the opinion evidence, the ALJ found the assessment of the agency medical consultants that plaintiff could handle light work mostly persuasive. (Tr. at 23.) While these consultants lacked a treating or examining relationship with plaintiff, they performed a thorough review of the available medical records and had comprehensive understanding of agency rules and regulations. Their opinions were mostly consistent with the record as a whole, particularly plaintiff's documented improvement with immunosuppressive therapy and imaging confirming that some fistulas resolved. The ALJ added environmental limitations to account for plaintiff's testimony regarding her non-severe eye impairment. (Tr. at 24.)

The ALJ found less persuasive the questionnaires completed by plaintiff's treating providers. Physician's assistant Caroline Fox opined that plaintiff required a sit/stand option at will, ready access to a bathroom, two to three bathroom breaks each day lasting 15 minutes, the option to lie down for 10 to 15 minutes at least once during the week, and three absences per month. Plaintiff's gastroenterologist, Andres Yarur, M.D., opined that plaintiff would be off task over 15% of the workday, could sit for not more than two hours and stand less than two hours in a workday, and required unscheduled bathroom breaks four times each day and additional breaks to lie down twice per day. Dr. Yarur went on to state that plaintiff had been unable to work for many years due to her Crohn's disease. The ALJ first noted that statements that a claimant is disabled or unable to work are not medical opinions but rather administrative findings reserved to the Commissioner. Second, he noted that Ms. Fox and Dr. Yarur lacked programmatic knowledge. Third, while these providers had a treating relationship with plaintiff, personally and frequently examining her in a clinical setting, their contemporaneous treatment notes did not support the disabling limitations they suggested. Similarly, the record as a whole was inconsistent with the disabling limits they assessed. For example, plaintiff's activities outside the home undermined a requirement for ready access to a bathroom, and her bathroom diary documented bowel movements one to three times per day on average. Fourth, plaintiff herself made no allegation that she needed to lie down at the frequency opined by Ms. Fox or Dr. Yarur. (Tr. at 24.)

The ALJ concluded:

In sum, although the evidence establishes underlying medical conditions capable of producing some limitations, the substantial evidence of record does not confirm the disabling limitations alleged by [plaintiff] or her representative. Rather, the above residual functional capacity assessment is supported by the objective medical evidence, medical opinions, and the other factors discussed

10

in this decision. [Plaintiff's] Crohn's disease, and associated pain and fatigue, dictates that she would be limited to light work. Additionally, the undersigned gave full consideration to [plaintiff's] alleged vision sensitivities, albeit stemming from her non-severe vision impairments, in restricting [plaintiff] from jobs performed outdoors. Further limitation would be unwarranted as [plaintiff's] subjective complaints are only partially consistent with the record as a whole.

(Tr. at 25.)

On January 28, 2021, the Appeals Council denied plaintiff's request for review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's application. See Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012). This action followed.

## III. DISCUSSION

### A. Urgency/Frequency

Plaintiff argues that the ALJ failed to account for her bowel urgency or frequency. (Pl.'s Br. at 7.) The ALJ found her Crohn's disease to be severe, yet the only limitation included in the RFC to account for this impairment was a restriction to light work. (Pl.'s Br. at 7-8; Pl.'s Rep. Br. at 4-5.) Plaintiff cites her hearing testimony of two to four bowel movements per day (six during a flare) and related bowel urgency (30 seconds to make it to the bathroom). (Pl.'s Br. at 8; Pl.'s Rep. Br. at 5.) She contends that this testimony is consistent with the record, including her reports to providers of multiple bowel movement per day with associated urgency and the reports of her treating providers that she needed extra breaks and ready access to a restroom. (Pl.'s Br. at 8-9; Pl.'s Rep. Br. at 5-6.) The VE testified that the need to suddenly leave the workstation to use the bathroom for 15 minutes, outside of regular break times, would eliminate competitive employment. (Pl.'s Br. at 9; Pl.'s Rep. Br. at 6.) Plaintiff concludes:

The ALJ's RFC does not account for ready access to a bathroom, bathroom urgency, or need to use a bathroom on an unscheduled basis at all. As these are clearly well-supported (and work preclusive) limitations, the ALJ's error

11

constitutes material legal error. <u>Young v. Barnhart</u>, 362 F.3d 995, 1005 (7th Cir. 2004) ("When the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand.").

(Pl.'s Br. at 9-10.)

An ALJ is not required to include in the RFC and the hypothetical every limitation the claimant alleges, only those he "accepts as credible." <u>Schmidt v. Astrue</u>, 496 F.3d 833, 846 (7th Cir. 2007); <u>see also</u> <u>Reynolds</u>, 25 F.4th at 473 ("Crucially, however, an ALJ need only include limitations that are supported by the medical record."). Here, the ALJ provided several reasons for discounting plaintiff's allegations of frequency and urgency: her daily activities called those claims into question, her bathroom diary contradicted her testimony regarding "bad" days, and the medical evidence reflected improvement with immunosuppressive treatment. (Tr. at 23.) The ALJ also addressed—and rejected—the related limitations suggested by the treating providers, noting that their contemporaneous treatment notes did not support disabling limitations, that plaintiff's activities outside the home undermined a requirement for ready access to a bathroom, that plaintiff's bathroom diary contradicted her alleged frequency of bowel movements and bad days, and plaintiff herself made no allegation that she needed to lie down at the frequency suggested by the providers. (Tr. at 24.) Finally, the ALJ addressed the objective medical evidence, noting that plaintiff experienced ongoing symptoms from 2013 to 2018 but by August and September 2019 she reported improvement (Tr. at 22) and her treatment since the amended onset date was conservative and limited (Tr. at 23).

Plaintiff fails to address the ALJ's analysis in making her first argument. The ALJ was not <u>required</u> to include any particular limitations (e.g., extra bathroom breaks) just because he

12

found plaintiff's Crohn's disease to be a severe impairment.  See Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005) ("Even assuming the accuracy of Schmidt's unsupported contention that some persons with IBS may experience fatigue, this does not mean that Schmidt suffers this symptom; the ALJ was correct in noting that there is no objective support in the medical records for Schmidt's contention that he suffers from IBS-related fatigue."); Stobbe v. Kijakazi, No. 20-C-777, 2021 U.S. Dist. LEXIS 148493, at *70 (E.D. Wis. Aug. 9, 2021) ("[T]hat a condition often causes certain symptoms does not mean that a given claimant with that condition suffers from those symptoms, much less that her symptoms are of disabling severity.").  The issue, then, is whether the reasons the ALJ gave for discounting plaintiff's urgency and frequency claims withstand scrutiny.[2]

## B.    Plaintiff's Statements

Plaintiff argues that the ALJ erred in finding her statements "not entirely consistent" with the record.  (Pl.'s Br. at 10.)  As the ALJ noted, the regulations set forth a two-step process for symptom evaluation.  (Tr. at 20.)  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function.  Id. at *9.  If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record

---

[2]In reply, plaintiff faults the Commissioner for not directly addressing her first argument (Pl.'s Rep. Br. at 4), but as indicated in the text the success of this argument depends on whether the ALJ gave sufficient reasons for discounting plaintiff's testimony and the opinions of her treating providers, issues the Commissioner does address in her response.

13

and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness and side effects of any medications taken, and other treatment received for relief of the pain or other symptoms. *Id.* at *18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. If the ALJ gives specific reasons supported by the record, the court will overturn his credibility determination only if it is "patently wrong." Deborah M. v. Saul, 994 F.3d 785, 789 (7th Cir. 2021).

As indicated above, the ALJ discounted plaintiff's statements based on her daily activities, bathroom diary, and reported improvement and conservative treatment during the relevant period. Plaintiff argues that the ALJ misconstrued the record in making these findings. (Pl.'s Br. at 11.)

Plaintiff first contends that the ALJ relied on her activities without acknowledging her significant limitations in performing them. (Pl.'s Br. at 11-12.) "[I]t is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of [her] impairments was credible or exaggerated." Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016). On the other hand, the "ALJ cannot disregard a claimant's limitations in performing household activities." Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009).

The ALJ relied on plaintiff's ability to "cook meals, grocery shop, attend exercise classes, and accompany her elderly parents to all of their numerous medical appointments." (Tr. at 23.) In her function report, plaintiff wrote that she prepared "very simple and plain" meals (Tr. at

14

227); at the hearing, she testified: "I do really simple meals, you know, like things I can microwave them or cold." (Tr. at 47.) In the function report, plaintiff wrote that she shopped for groceries once every 10-12 days (Tr. at 228), but she later explained that at times she relied on her parents to take her to appointments and shop for her because she was unable to drive due to rectal pain. (Tr. at 237.) In the function report, plaintiff reported attending an exercise class twice per week, but the report does not specify how long those classes lasted or what they entailed. (Tr. at 229.) At the hearing, plaintiff testified that pre-COVID she "had some exercise classes . . . through medical groups" (Tr. at 48), but the ALJ did not follow up regarding what those classes had entailed when plaintiff was attending them. And in the report, plaintiff wrote: "I now go to as many of their doctor appointments as possible." (Tr. 233.) However, in the very next paragraph of the report she described her routine for doctor appointment days, getting up two hours before leaving the house to try to get her bowel under control and eating just a small amount, to try to minimize the need for a bathroom while away from home. (Tr. at 233.)

The ALJ did not consider these qualifications or otherwise explain how activities (like the exercise class) undermined plaintiff's alleged standing/walking tolerance or need to remain near a bathroom. See Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) (stating that "ALJs must explain perceived inconsistencies between a claimant's activities" and her allegations). The Commissioner responds that the ALJ was not required to specifically discuss "every qualification" plaintiff alleged (Def.'s Br. at 5, citing Valentin v. Saul, No. 19-CV-1626-SCD, 2020 U.S. Dist. LEXIS 166213, at *17 (E.D. Wis. Sept. 11, 2020)), but in Valentin the ALJ at least generally considered the claimant's limitations, id. at *17-18, unlike here.

Plaintiff further contends that the ALJ mis-characterized her testimony in finding a

15

contradiction with her activities: plaintiff did not testify that she is always within 30 seconds of a bathroom; rather, she said she experienced urgency and had 30 seconds to make it to the bathroom. (Pl.'s Br. at 12, citing Tr. at 48.) That she had accidents and wore gauze or panty liners as protective measures shows that she did not actually remain within 30 seconds of a toilet at all times. (Pl.'s Br. at 12, citing Tr. at 43, 1328, 1441, 1616.) In response, the Commissioner elides the problem, arguing that it was reasonable for the ALJ to doubt the accuracy plaintiff's testimony that she had only 30 seconds of notice before needing the bathroom, given the activities the ALJ listed. (Def.'s Br. at 5.) That is not the finding the ALJ made. (Tr. at 23: "[T]hese activities, particularly those outside the claimant's home, call into question her allegation that she must remain within 30 seconds from a bathroom at all times.".) The Commissioner does not address plaintiff's contention that she continues to experience accidents and must use protective material.

Second, plaintiff challenges the ALJ's reliance on her bathroom diary. (Pl.'s Br. at 12.) Plaintiff testified to an average of two to four bowel movements per day (Tr. at 41), while the journal documented one to three on most days (Tr. at 311-412). Plaintiff testified to bad days once or twice per month where she used the bathroom "closer to six times" (Tr. at 49); the journal documented eight days (over a roughly four-month period) where she used the bathroom four to five times (and one day where she used it six times). Plaintiff argues this is hardly inconsistent. (Pl.'s Br. at 12-13.)

While the discrepancy may not be large, under the deferential standard of review, I cannot say it was unreasonable for the ALJ to rely on the diary as part of his analysis. See Schloesser v. Berryhill, 870 F.3d 712, 721 (7th Cir. 2017) ("[D]isregarding Schloesser's subjective testimony where it contradicts with contemporaneous reports he made to his

16

physicians and their independent observations is permissible."). Plaintiff's stronger argument is that, even if the diary suggests she did not need to use the bathroom quite as often as she testified, the diary does not refute her need for at least some unscheduled breaks to use the bathroom on an urgent basis. (Pl.'s Br. at 13.) The VE testified that no jobs would be available for a person who had to suddenly leave the workstation twice per week to use the bathroom for up to 15 minutes (outside of regular break times). (Tr. at 59.) Plaintiff contends that whether she uses the bathroom one to three times or two to fours times on an average day, or whether flare days involves four to five uses or six uses, the evidence supports a finding that she would require at least two urgent, unscheduled breaks per week. (Pl.'s Br at 13.) The Commissioner does not specifically address this argument in her response.

Third, plaintiff contends that while the record contains notations of "improvement" she continued to report urgency, incontinence, and several bowel movements per day. (Pl.'s Br. at 13-14, citing Tr. at 1170.) As for the ALJ's finding that her treatment was "conservative" after the alleged onset date, plaintiff notes that after attempting numerous treatments over a several year period, by May 2020, her gastroenterologist noted: "From a medical GI perspective we have little left to offer her and surgery is not comfortable with moving forward with attempt at surgical repair of fistulae right now given lack of progress with biologics." (Tr. at 1616.)

The Commissioner responds that conservative treatment is a factor the ALJ may consider when evaluating subjective symptoms, and symptoms alleviated by medication are not disabling. (Def.'s Br. at 6, citing Curvin v. Colvin, 778 F.3d 645, 651 (7th Cir. 2015); Simila v. Astrue, 573 F.3d 503, 519 (7th Cir. 2009).) As the ALJ noted, while plaintiff received extensive treatment prior to the alleged onset date, she thereafter received more conservative treatment and reported improvement. (Def.'s Br. at 6-7.) But the Commissioner does not

17

respond to plaintiff's argument that treatment was conservative because her providers had run out of options. See Hill v. Colvin, 807 F.3d 862, 868 (7th Cir. 2015) (remanding where "the ALJ ignored explanations for the conservative treatment"). And, while it was proper for the ALJ to note the references to improvement, the record also contains some indications during the relevant period that plaintiff "continues to feel poorly." (Tr. at 1616.) The ALJ's reliance on the objective medical evidence cannot, under these circumstances, salvage the credibility finding. See Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits.").

## C.     Treating Provider Opinions

Plaintiff argues that the ALJ erred in evaluating the opinions from treating providers Fox and Yarur. (Pl.'s Br. at 15.) Under the regulations applicable to this claim, an ALJ evaluates medical opinions based on supportability (the amount of objective medical evidence and supporting explanations provided by the source), consistency (how consistent the opinion is with the other evidence), relationship with the claimant (treatment relationship, frequency of examinations), specialization of the source, and other factors (such as the source's familiarity with the other evidence in the case or an understanding of the disability program's policies and evidentiary requirements). 20 C.F.R. § 416.920c(c). The factors of supportability and consistency are the most important in determining how persuasive a source's medical opinions are. 20 C.F.R. § 416.920c(b)(2).

Here, the ALJ discounted the treating provider opinions because: (1) Dr. Yarur's statement that plaintiff "has not been able to work" intruded on an area reserved to the Commissioner, and neither provider has knowledge of disability program requirements; (2) their treatment notes did not support the disabling limitations they suggested, and plaintiff's activities

18

and bathroom diary were inconsistent those limitations; and (3) plaintiff did not allege the need to lie down at the frequency opined by the providers.  (Tr. at 24.)

For the reasons stated above, the ALJ's reliance on plaintiff's activities and bathroom diary requires further explanation.[3]  And, as plaintiff notes, the ALJ misstated the record in claiming she did not allege the need to lie down.  (Pl.'s Br. at 17.)  At the hearing, plaintiff testified that she was "fatigued all the time . . . so I usually I'm lying down on my couch."  (Tr. at 42.)  She later clarified that during a normal eight-hour daytime period she was lying down "half that time."  (Tr. at 50.)  In her pre-hearing function report, plaintiff wrote: "I spend most of my time lying down."  (Tr. at 237.)  She also reported fatigue related to the biologic and amount of time she spent on the toilet.  (Tr. at 238.)

The Commissioner responds that even if the court finds the ALJ's final reason unpersuasive, he gave multiple other reasons for not adopting these opinions.  (Def.'s Br. at 11, citing Simila, 573 F.3d at 516 ("[A]ny error here was harmless given the other reasons the ALJ cited for discounting Dr. Caillier's opinions.").)  However, given the problems with the other reasons, discussed above, I cannot agree.  The Commissioner argues that the ALJ reasonably rejected the providers' opinions regarding the need to lie down based on plaintiff's activities outside the home.  (Def.'s Br. at 11.)  But the extent of those activities requires further exploration, as also indicated above.

_____

[3]The Commissioner notes that the diary documented one to three bowel movements during most 24-hour days, while the providers suggested the need for two to four extra bathroom breaks per eight-hour working day.  (Def.'s Br. at 10; Tr. at 1159, 1570.)  While this is a distinction the ALJ may consider, the key issue is not how many times plaintiff uses the toilet per day but whether she requires unscheduled breaks on an urgent or unpredictable basis.  Per the VE, even two such breaks per week would preclude employment.

19

**D.     Remedy**

Plaintiff argues for a judicial award of benefits, as the work-preclusive limitations of Ms. Fox and Dr. Yarur are consistent with and supported by the record as a whole.  In particular, plaintiff contends that the record supports a need for unscheduled (urgent) bathroom breaks twice per week, warranting an award of benefits given the VE's testimony that such breaks would eliminate all jobs.  (Pl.'s Br. at 18; Pl.'s Rep. Br. at 6.)

The usual remedy when the court finds error is to remand for further proceedings, particularly in cases where the ALJ overlooked or misconstrued evidence in evaluating a claimant's testimony or the opinions of treating providers.  See Hendrickson v. Kijakazi, No. 20-C-1583, 2021 U.S. Dist. LEXIS 242038, at *38-39 (E.D. Wis. Dec. 20, 2021).  "This is so because it is the ALJ's job, not the reviewing court's, to weigh competing evidence and determine in the first instance whether the claimant is disabled."  Charles v. Colvin, No. 14-C-513, 2014 U.S. Dist. LEXIS 161296, at *3 (E.D. Wis. Nov. 18, 2014); see also Dudley T. v. Comm'r of Soc. Sec., No. 4:17-cv-04264-JEH, 2019 U.S. Dist. LEXIS 43475, at *23-24 (C.D. Ill. Mar. 18, 2019) (remanding where the ALJ failed to properly consider limited daily activities); Hunt v. Astrue, 889 F. Supp. 2d 1129, 1149 (E.D. Wis. 2012) (remanding for reconsideration of medical opinions and claimant credibility).

Further, the record contains evidence, including the opinions of the agency medical consultants,[4] plaintiff's bathroom diary, daily activities at least arguably inconsistent with

_____

[4]Plaintiff does not address the ALJ's reliance on the opinions from these professionals, who reviewed all of the available medical evidence and considered plaintiff's Crohn's disease, with knowledge of the disability program's requirements.  See Stephens v. Berryhill, 888 F.3d 323, 329 (7th Cir. 2018) (affirming where the ALJ relied on state agency reviewing physicians).  Nor does she address the ALJ's finding that her providers' reports lack support in their own contemporaneous treatment notes.  See Pavlicek v. Saul, 994 F.3d 777, 781 (7th Cir. 2021)

plaintiff's claims of disabling symptoms, and the indications of improvement in plaintiff's condition during the relevant period, supporting denial of the claim.  See Charles, 2014 U.S. Dist. LEXIS 161296, at *4 (remanding where the record contained conflicting evidence, including a consultant's opinion); see also Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011) ("An award of benefits is appropriate . . . only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits.").

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.  The clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 18th day of April, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

---

("An ALJ may decline to give a treating physician's opinion controlling weight when the opinion is inconsistent with the physician's treatment notes.").

21